Filed 9/4/25  P. v. Cole CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>THEODORE COLE,<br><br>Defendant and Appellant. | C101466<br><br>(Super. Ct. No. 01F06209) |

Defendant Theodore Cole appeals the denial of his petition for resentencing after an evidentiary hearing pursuant to Penal Code section 1172.6, subdivision (d).[1]  He contends the evidence was insufficient to prove he is guilty of felony murder beyond a

---

[1]     Effective June 30, 2022, the Legislature renumbered former section 1170.95 as section 1172.6.  (Stats. 2022, ch. 58, § 10.)  There were no substantive changes to the statute.  Although defendant filed his petition under former section 1170.95, we cite the current section 1172.6 throughout this opinion.

Undesignated section references are to the Penal Code.

1

reasonable doubt. We agree. The fatal shooting was unplanned and inadvertent and happened one to six seconds after codefendant demanded money from the victim who was working inside a food truck. At the time of the shooting, defendant was sitting in a car behind the food truck. Codefendant ran to the waiting car, did not tell defendant he had shot the victim, and they sped off. There is no evidence that a plan for codefendant to use a gun in the robbery was contemplated by or communicated to defendant. There is no evidence defendant provided the gun. There is no evidence codefendant had a history of violence or had previously used or brandished a gun. And the first time defendant had knowledge that codefendant had shot the victim was after defendant returned home and had awoken from a nap. Defendant's actions do not demonstrate a willingness to kill to achieve the robbery. We therefore reverse the trial court's order denying defendant's petition for resentencing and remand for the trial court to vacate defendant's murder conviction and resentence him.

FACTUAL AND PROCEDURAL BACKGROUND

The underlying facts are recited in our unpublished decision in *People v. Cole* (Mar. 26, 2004, C042903) [nonpub. opn.] (*Cole*). We provide a summary of these facts solely as context for the charges filed against defendant.

"The victim was working in a lunch truck, cleaning up after the lunch hour, when a man ran up and demanded money. The victim hesitated; the man fired a gun. The victim collapsed, later dying from a bullet wound to the heart. The man ran to a small blue car in which another man was waiting, and they sped off. The witnesses to the shooting could identify the driver only generally. However, a salesman who had spoken with the victim at length earlier in the lunch hour had noticed two men hanging around the lunch truck. They had been sitting in a small blue foreign car next to which he had parked. He quickly picked out codefendant Chiu's picture in a photographic lineup, and

2

thought [defendant's] picture was the closest to his recollection of the other man. At trial, he was certain that [defendant] was the other man.

"Defendant . . . was unemployed and living with his sister and her children, as were his sister's boyfriend (codefendant Chiu) and the siblings' cousin, Venus. The two defendants and Cousin Venus were heavy methamphetamine users when the sister was not around, and thus faced a quotidian struggle for cash to buy their drug of preference.

"Defendant . . . owned a blue Mitsubishi and a motorcycle; codefendant Chiu owned a red Jeep. Lacking a license, codefendant Chiu usually did not drive the Jeep if someone was with him. Defendant . . . preferred to use his motorcycle and rarely drove his car. Cousin Venus frequently drove both the car and the Jeep.

"According to Cousin Venus, about a month before the crimes took place, she had told the two codefendants that when she had worked for a telemarketer on Old Placerville Road, she and the other employees had often cashed their paychecks at a lunch truck that visited her place of employment. She therefore believed the lunch truck kept thousands of dollars on hand. She suggested the lunch truck as a possible source of cash for them, but there were no specific plans for robbing the truck at that time.

"On the day of the crimes, Cousin Venus was now living at a different location. She walked to her cousins' nearby house. She and codefendant Chiu drove off in the Jeep. As she talked to him about trying to work out her relationship with her boyfriend, codefendant Chiu suggested they drive to her boyfriend's home. They picked up her boyfriend and returned to the cousins' house. Switching to the blue car, codefendant Chiu dropped them off at the home of her boyfriend's mother. Codefendant Chiu later returned in the Jeep, along with defendant . . . in the blue car. Codefendant Chiu asked her to drive the Jeep, then got in the blue car with defendant . . . and drove off. Cousin Venus followed.

"Cousin Venus claimed that she thought they might be on their way to buy or steal drugs. The blue car stopped in an unfamiliar building complex on Old Placerville Road. The two defendants told her to wait there, then drove off in the blue car with defendant . . . at the wheel. She did not see them with the gun that codefendant Chiu owned. When they returned, they were in a hurry. [Chui] told Cousin Venus to take the rear license plate for the blue car (which was on the seat next to her; she claimed that she could not recall if they had handed it to her earlier), then they drove off in the Jeep. She put the license plate back on the blue car and drove back to her cousins' home. As she left, she noticed police driving in the opposite direction with activated lights and sirens, and guessed that it had something to do with the two defendants.

"When Cousin Venus arrived, [defendant's] sister relayed a phone message from him to put the blue car in the garage. They moved a few things to make room. The two defendants returned a few hours later in the Jeep. Defendant . . . went straight to his room. She watched the television news with codefendant Chiu, who did not react to a report about a shooting at a lunch truck on Old Placerville Road. Cousin Venus and [defendant's] sister were shocked when codefendant Chiu then discussed his connection with the shooting. Later that night, codefendant Chiu admitted to Cousin Venus that he shot the man at the lunch truck during an attempted robbery, and defendant . . . expressed concern that bystanders might have seen a cartoon tattoo on his shoulder while he sat in the car.

"After her jailed husband called her attention to a composite sketch resembling codefendant Chiu in the Sacramento Bee, Cousin Venus became concerned about her involvement and wondered if she should take advantage of a $10,000 reward offer. Her husband told her to talk with his father. Her father-in-law reported her anonymously to the police, along with codefendant Chiu and a man he knew as 'Big Stuff' ([defendant's] nickname). . . .

"Testifying in this trial, codefendant Chiu admitted killing the victim. He claimed Cousin Venus was the one who was intent on committing the robbery and had been the one accompanying him to the lunch truck, while defendant . . . was at home. He never called the house to tell the women to put the blue car in the garage, which would have required an 'act of God' given the heavy equipment scattered throughout it.

"[Defendant's] mother claimed to have talked to him and his sister during the lunch hour on the day of the shooting about their Mother's Day plans for the next day. [Defendant's] sister testified that she thought she had heard him working in the garage throughout the day while she was in the house. She denied telling Cousin Venus about a phone call to put the blue car in the garage (claiming that this would have been impossible in any event), and denied being present for any conversations in which either defendant admitted complicity in the crimes. [Defendant's] stepmother, who lived next door, testified that the blue car was never inside the crammed garage on the day of the shooting or any other time that defendant lived there. On the morning of the crimes, she saw defendant . . . working in the garage. She also saw Cousin Venus and her boyfriend around the corner walking from the blue car; Cousin Venus told her it was out of gas." (*Cole*, *supra*, C042903, fns. omitted.)

A jury found defendant guilty of first degree felony murder (§§ 187/189; count one) with an attempted robbery special circumstance (§ 190.2, subd. (a)(17)) and attempted robbery (§§ 664/211; count two). The trial court sentenced defendant to life in prison without parole on the felony murder count and two years, stayed pursuant to section 654, on the attempted robbery count. A separate panel of this court affirmed these convictions in an unpublished decision issued in 2004. (*Cole*, *supra*, C042903, review den. June 9, 2004, S124337.)

In 2020, defendant filed a petition for resentencing pursuant to section 1172.6, and in 2021, the trial court denied the petition at the prima facie stage, finding the jury

5

instructions and jury findings from defendant's original trial established his ineligibility for relief as a matter of law, which was permissible under published authority. Defendant appealed.

During the pendency of his appeal, the California Supreme Court decided *People v. Strong* (2022) 13 Cal.5th 698, which held: "Findings issued by a jury before *Banks* [(2015) 61 Cal.4th 788 [*Banks*]] and *Clark* [(2016), 63 Cal.4th 522 [*Clark*]] do not preclude a defendant from making out a prima facie case for relief under Senate Bill [No. ]1437 [(2017-2018 Reg. Sess.) (Senate Bill No. 1437]. This is true even if the trial evidence would have been sufficient to support the findings under *Banks* and *Clark*." (*Strong*, at p. 710.) A second panel of this court reversed the trial court's order concluding it erred in finding the jury's pre-*Banks* and *Clark* findings precluded defendant from making a prima facie case as a matter of law. (*People v. Cole* (Jan. 24, 2023, C093908) [nonpub. opn.].)

The parties filed further briefing and the trial court held an evidentiary hearing. After the hearing, the trial court took the matter under submission and the parties filed supplemental briefs. In June 2024, after reviewing the record from defendant's trial, appeal, parties' briefing, and applicable law, the trial court filed a 22-page written order denying the petition, finding defendant "guilty, beyond a reasonable doubt, of murder as a major participant who acted with reckless indifference to human life during the course of a qualifying felony."

Defendant timely appeals.

## DISCUSSION

A.    *Additional Facts*

In the trial court's written order, it found defendant's knowledge of weapons and the use of weapons in the crime weighed against defendant because he "knew a weapon would be used during the commission of the crime and that . . . based on the robbery

6

plan, Chiu would point a weapon directly at the food truck operator, at close range, in order to obtain the cash inside." It found defendant "had an opportunity to restrain Chiu by getting out of the vehicle but chose not to." The trial court found his failure to restrain Chiu "[c]oupled with [d]efendant's involvement in planning" weighed in favor of finding defendant possessed the requisite mental state of reckless indifference to human life. The trial court conceded the brief duration of the robbery did not "weigh heavily" in favor of finding a reckless indifference to human life. However, it found "the totality of factors," such as defendant's knowledge Chiu commonly carried a gun and was constantly looking for ways to fund his methamphetamine habit demonstrated defendant acted with reckless indifference to human life. The trial court also found defendant "did not take any action to reduce the risk of violence during the course of the felony" because he "sat in the driver's seat [of a car] in close proximity to the food truck" during the robbery.

B.    *Legal Principles*

Effective January 1, 2019, the Legislature enacted Senate Bill No. 1437 " 'to more equitably sentence offenders in accordance with their involvement in homicides.' " (*People v. Curiel* (2023) 15 Cal.5th 433, 448.) "Defendants who were neither actual killers nor acted with the intent to kill can be held liable for murder only if they were 'major participant[s] in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of . . . [s]ection 190.2'—that is, the statute defining the felony-murder special circumstance. (. . . § 189, subd. (e)(3).)" (*People v. Strong* (2022) 13 Cal.5th 698, 708.) After defendant's conviction became final, *Banks* and *Clark* "substantially clarified the law governing findings under . . . section 190.2, subdivision (d): *Banks* elucidated what it means to be a major participant and, to a lesser extent, what it means to act with reckless indifference to human life, while *Clark* further refined the reckless indifference inquiry." (*Strong*, at pp. 706-707.)

7

Senate Bill No. 1437 also created a procedural mechanism for defendants with eligible murder convictions to seek retroactive relief under the amended law. (*Strong*, *supra*, 13 Cal.5th at p. 708.) Under section 1172.6, if a petitioner makes a prima facie showing of entitlement to relief, the trial court must issue an order to show cause (§ 1172.6, subd. (c)) and hold an evidentiary hearing at which the prosecution bears the burden of proving "beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder" under the law as amended by Senate Bill No. 1437. (§ 1172.6, subd. (d)(3).)

We review a trial court's denial of a section 1172.6 petition for substantial evidence. (*People v. Njoku* (2023) 95 Cal.App.5th 27, 42.) We presume in support of the judgment the existence of every fact that can be reasonably deduced from the evidence, whether direct or circumstantial. (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1022; see also *Clark*, *supra*, 63 Cal.4th at p. 610.)

Defendant contends that, at most, the evidence shows he participated in a spontaneous armed robbery, but the evidence does not show that he acted with reckless disregard to human life and thus does not satisfy the elements of felony murder. We need not decide whether defendant was a major participant because we conclude that the evidence was insufficient to support that he exhibited reckless indifference to human life. (See *Clark, supra*, 63 Cal.4th at p. 611.)

C.     *Analysis*

Reckless indifference to human life is " 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' " (*Clark*, *supra*, 63 Cal.4th at p. 616.) It "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at p. 617.) In this context, recklessness has both a subjective and an objective component. (*Ibid.*) Subjectively, " '[t]he defendant must be aware of and

8

willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' " (*In re Scoggins* (2020) 9 Cal.5th 667, 677.) Objectively, recklessness is determined by whether defendant's conduct " 'involved a gross deviation from the standard of conduct that a law-abiding person in the actor's situation would observe.' " (*Clark*, at p. 617.)

We consider a number of factors in determining whether the evidence is sufficient to establish reckless indifference: (1) the use and number of weapons and the defendant's knowledge of them, (2) the defendant's physical presence at the scene of the killing and the opportunities to stop the crime or aid the victim, (3) the duration of the felony, (4) defendant's knowledge that his criminal partner was likely to kill, and (5) the defendant's effort to minimize the risk of the felony. (*Clark*, *supra*, 63 Cal.4th at pp. 618-623.) As with the major participant factors, " '[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Id.* at p. 618.)

Applying the *Clark* factors here, the evidence supports the inference that defendant had knowledge that Chiu, his friend and roommate -- who owned a gun -- could have been armed during the robbery. (See *Clark*, *supra*, 63 Cal.4th at p. 626 [we must accept reasonable inferences].) The use of a firearm during an armed robbery is an important consideration but, as the Supreme Court in *Clark* stated, there must be something "in the plan that one can point to that elevated the risk to human life beyond those risks inherent in any armed robbery" to show reckless indifference to human life. (*Id.* at p. 623.) Here, contrary to the trial court's finding, there is no support in the record that defendant engaged in the planning of the robbery, outside casing the food truck on the day of the robbery. Cousin Venus testified she gave Chiu and defendant information about the food truck about three to four weeks before the robbery but denied developing any plans with them and had no further conversations with either Chiu or defendant about

any robbery plan. There is no evidence a plan for Chiu to use a gun in the robbery was contemplated by or communicated to defendant. The People concede there is no evidence defendant provided Chiu with a gun for the robbery. There is also no evidence Chiu had a history of violence or previously used or brandished a gun. Even if defendant had knowledge Chiu was prone to some degree of violence, " '[a]wareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' " to satisfy the reckless indifference to human life element. (*In re Scoggins*, *supra*, 9 Cal.5th at p. 682.)

"Proximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force." (*Clark*, *supra*, 63 Cal.4th at p. 619.) The trial court found defendant was present at the crime and "chose not to" stop Chiu. Although defendant was present at the robbery, he was sitting in the car and behind the food truck, and witness testimony indicates only one to six seconds passed from the time Chiu demanded money and inadvertently fired the gun, killing the victim. Because the shooting happened within seconds of the initiation of the robbery, defendant had no opportunity to restrain Chiu. (*In re Scoggins*, *supra*, 9 Cal.5th at p. 679 [Despite close contact with accomplices before the shooting, the defendant lacked control over their actions once they arrived on the crime scene, especially in light of how quickly the shooting occurred].) The evidence demonstrates defendant was in the car behind the food truck, not physically present with Chiu, and could not intervene when Chiu shot the victim. (Compare *Clark*, *supra*, 63 Cal.4th at p. 620 [facts supported a lack of reckless indifference where the defendant was not present during the shooting and there was no evidence to suggest he instructed use of lethal force and had no opportunity to prevent the victim's killing] with *People v. Mitchell* (2022) 81 Cal.App.5th 575, 594 [the defendant's

10

act of robbing the victim while the victim lay bleeding unambiguously showed indifference].) The evidence also shows the first time defendant had knowledge Chiu shot the victim was after defendant had returned home and had woken from a nap. Because Chiu inadvertently discharged the gun, immediately ran away, and did not tell anyone he shot the victim until he and defendant returned home, defendant did not have an opportunity to render aid to the victim. Thus, the trial court's finding that defendant was present for the shooting and chose not to assist the victim is not supported by the evidence.

The trial court acknowledged the robbery was brief and that the factor relating to the duration of the felony did not "weigh heavily" in favor of finding a reckless indifference to human life. The People concede the duration of the crime was brief and that it does not weigh in favor of finding of reckless indifference to human life. We agree.

The trial court found defendant "did not take any action to reduce the risk of violence" and that his "actions during the robbery demonstrate a commitment to seeing the plan through. This finding is not supported by substantial evidence. (*In re Scoggins*, *supra*, 9 Cal.5th at p. 677 [" '[T]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create' "].) As discussed, *infra*, there is no evidence Chiu had a history of violence or previously used or brandished a gun and the shooting took place so quickly after the start of the robbery that defendant could not have prevented the killing. And outside of being present to case the food truck, there is no evidence defendant was involved in the planning of the robbery, directed Chiu to use a gun, or provided Chiu with a gun.

Our Supreme Court explained the phrase "garden variety armed robbery" applies when "the only factor supporting reckless indifference to human life is the fact of the use

11

of a gun." (*Clark*, *supra*, 63 Cal.4th at p. 617, fn. 74.) The circumstances of this case fit that definition. The shooting was unplanned and happened when Chui inadvertently fired the gun into the food truck. Defendant's actions do not demonstrate a willingness to kill to achieve the robbery. (*Id.* at p. 618.)

Because the finding defendant acted with reckless indifference to human life is not supported by substantial evidence, the record does not establish defendant is guilty of felony murder. Defendant needs to be resentenced. In light of our conclusions, we need not address defendant's remaining arguments.

## DISPOSITION

We reverse the trial court's order denying defendant's petition for resentencing under section 1172.6. The case is remanded to the trial court to vacate defendant's murder conviction and resentence him.

/s/
MESIWALA, J.

We concur:

/s/
HULL, Acting P. J.

/s/
ROBIE, J.

12